1

1  IN THE UNITED STATES DISTRICT COURT

2  FOR THE MIDDLE DISTRICT OF ALABAMA

3   NORTHERN DIVISION

4

5 HARRISON JOHNSON, JR., et al.,

6  Plaintiffs,

7 Vs.    CIVIL ACTION NO.
      2:06-CV-290-SRW

8 BRIDGESTONE FIRESTONE NORTH
 AMERICAN TIRE, LLC, et al.,

9
  Defendants.

10

11

12

13  * * * * * * * * * * * *

14

15  DEPOSITION OF PHIL OWENS, taken pursuant to

 stipulation and agreement before Haley A. Phillips,
16
 Certified Shorthand Reporter, and Commissioner for
17
 the State of Alabama at Large, at Maypole
18
 Chevrolet, 1223 South Big A Road, Taccoa, Georgia,
19
 on Wednesday, April 19, 2006, commencing at
20
 approximately 2:00 p.m. EST.
21

22  * * * * * * * * * * * *

23

```
 1                APPEARANCES

 2

 3   FOR THE PLAINTIFF:

 4   Blaine C. Stevens, Esq.
     Strickland, Chancellor & Kendall
 5   Attorneys at Law
     420 South Lawrence
 6   Montgomery, Alabama  36104

 7   FOR THE DEFENDANT:

 8   Roger S. Morrow, Esq.
     Morrow, Romine & Pearson
 9   Attorneys at Law
     122 South Hull Street
10   Montgomery, Alabama  36104

11   William A. Mudd, Esq.
     Sadler Sullivan, P.C.
12   Attorneys at Law
     Suite 2500
13   420 North 20th Street
     Birmingham, Alabama  35203
14
     Kenneth M. Perry, Esq.
15   Bradley, Arant, Rose & White
     Attorneys at Law
16   1819 5th Avenue North
     Birmingham, Alabama  35203
17
     Keith J. Pflaum, Esq. (via telephone)
18   Porterfield, Harper, Mills & Motlow
     Attorneys at Law
19   Suite 600
     22 Inverness Center Parkway
20   Birmingham, Alabama  35253

21   Andrew S. Nix, Esq. (via telephone)
     Lightfoot, Franklin & White
22   Attorneys at Law
     400 20th Street North
23   Birmingham, Alabama  35203
```

3

1    APPEARANCES (cont'd)

2 Rachel Rodgers, Esq. (via telephone)
  Pillsbury, Winthrop, Shaw & Pittman
3 Attorneys at Law
  2 Houston Center
4 909 Fannin, 22nd Floor
  Houston, Texas  77010
5
  ALSO PRESENT:
6
  Phil Adams
7

8   * * * * * * * * * * * * *

9    EXAMINATION INDEX

10  BY MR. STEVENS . . . . . . . . . . 6

11

    PLAINTIFF'S EXHIBIT INDEX
12
  1 Ledger Sheet for June 1985   30
13

14   * * * * * * * * * * * *

15

16

17

18

19

20

21

22

23

1            STIPULATION

2     It is hereby stipulated and agreed by and

3   between counsel representing the parties that the

4   deposition of PHIL OWENS is taken pursuant to the

5   Federal Rules of Civil Procedure and that said

6   deposition may be taken before Haley A. Phillips,

7   Certified Shorthand Reporter, and Commissioner for

8   the State of Alabama at Large, without the

9   formality of a commission, that objections to

10  questions other than objections as to the form of

11  the question need not be made at this time but may

12  be reserved for a ruling at such time as the said

13  deposition may be offered in evidence or used for

14  any other purpose by either party provided for by

15  the Statute.

16     It is further stipulated and agreed by and

17  between counsel representing the parties in this

18  case that the filing of said deposition is hereby

19  waived and may be introduced at the trial of this

20  case or used in any other manner by either party

21  hereto provided for by the Statute regardless of

22  the waiving of the filing of the same.

23     It is further stipulated and agreed by and

1  between the parties hereto and the witness that the

2  signature of the witness to this deposition is

3  hereby waived.

4            * * * * * * * * * * * * *

5            PHIL OWENS

6     The witness, after having first been duly

7  sworn to speak the truth, the whole truth and

8  nothing but the truth testified as follows:

9            MR. MUDD:  And before we start, I

10                have objected to a certain

11                aspect of the scope of the

12                deposition.  I think we have

13                the same agreement that you've

14                got with Mr. Morrow with

15                regard to our jurisdictional

16                defense, which will be six

17                defenses.  And I think we've

18                already got a structural

19                agreement on the scope of the

20                examination regarding those

21                defenses.  But we'll go

22                forward and see the best we

23                can do.

1          EXAMINATION

2  BY MR. STEVENS:

3   Q.  Give us your name, please.

4   A.  Phil David Owens.

5   Q.  Mr. Owens, I'm Blaine Stevens.  I represent

6        the plaintiffs in this case.  If you get a

7        question from me that you don't understand

8        for any reason, just stop me and I'll do my

9        best to try to clear it up for you.  You

10        own a company called Phil Owens Used Cars?

11   A.  Incorporated.

12   Q.  Incorporated.

13          How long have you been in business as

14        Phil Owens Used Cars, Inc.?

15   A.  Since 1975.

16   Q.  And just for the Record, what is the

17        business of Phil Owens Used Cars, Inc.?

18          What do y'all do?

19   A.  We are in the used car business from '75.

20   Q.  On through today?

21   A.  Uh-huh (positive response).

22   Q.  Do you ever sell new vehicles?

23   A.  Occasionally.

1   Q.   Occasionally.

2        Conversion vans.  Did you ever sell

3     conversion vans?

4   A.   Yes.

5   Q.   Were those sold as new vehicles sometimes?

6   A.   It would have to be sold -- You've got an

7     MSO with it, but you didn't get first

8     ownership.  I was the first ownership on an

9     MSO.

10  Q.   Tell me what the MSO.  What is that?

11     That's manufacturer's statement of origin?

12  A.   That's correct.

13  Q.   Okay.  Let me back up and get a little more

14     background from you, please, sir, before we

15     get into all that.  As far as Phil Owens

16     business is concerned, do -- have you ever

17     done business with people in Alabama?

18  A.   Yes.

19  Q.   You have.

20       What circumstances have you done

21     business in Alabama?

22  A.   Well, I first learned of Alabama dealers

23     through my van conversion business through

8

1    the Atlanta Auto Auction in Atlanta.

2  Q.  Right.

3  A.  And they relayed -- bought vans from me at

4    the Atlanta Auto Auction.  And then they

5    would give me calls when they need them,

6    and we would take them to them.

7  Q.  All right.  Just so I understand, your

8    contacts of Alabama dealt with your

9    conversion van business, sales of

10    conversion vans; correct?

11  A.  I had no agents over there, no.

12  Q.  I understand that.  I understand that.

13    But your contacts with people in

14    Alabama came about through the conversion

15    van business; right?

16  A.  True.

17  Q.  True.

18    All right.  And as I understand it, you

19    were taking vans over to the auction in

20    Atlanta?

21  A.  Right.

22  Q.  And there were people from Alabama,

23    dealerships, coming to the auction to buy

1    vans?

2    A.  Right.

3    Q.  And you had personal contact with these

4        people from Alabama who were buying vans

5        there at the auction?

6    A.  There at the auction, yes.

7    Q.  Who were you dealing with?  Can you give me

8        the names of any people you were dealing

9        with?

10   A.  Well, Cooper Chevrolet and Bill Deloach

11       Lincoln Mercury.  And then there's probably

12       some more, but I don't recall no more.

13   Q.  How often would you go over to the auction

14       and deliver vans to people in Alabama,

15       these dealerships you talk about, Cooper --

16           And who were the others?

17   A.  Bill Deloach Lincoln Mercury in --

18   Q.  Bill Deloach.

19   A.  -- Tuscaloosa.

20   Q.  Cooper and Bill Deloach.  Anybody else you

21       can recall?

22   A.  Not recall, I can't.

23   Q.  But you do recall Cooper and Deloach?

1   A.  Uh-huh (positive response).

2   Q.  How often would you go over to Atlanta and

3      see Cooper or Deloach?

4   A.  I don't know exactly when.

5   Q.  More than one occasion, though?

6   A.  Oh, yes.

7   Q.  And Cooper and Deloach came over here

8      specifically to buy vans to take back to

9      Alabama for resell?

10   A.  At the auction they would buy cars too.

11   Q.  Uh-huh (positive response).  I understand

12      that.

13   A.  It wasn't just for what I had, no.

14   Q.  But you specifically took conversion vans

15      over there for sell?

16   A.  Yes.

17   Q.  And you specifically took conversion vans

18      over there to sell to these particular

19      dealers in Alabama; right?

20   A.  Not --

21         MR. MUDD:  Just -- Let me -- Over

22            there, we're talking Atlanta,

23            Georgia auction?

1          MR. STEVENS:  Atlanta.

2          MR. MUDD:  Because over there is

3            kind of vague.  But go ahead.

4          MR. STEVENS:  I understand.

5   A.  When we took them to the auction and

6       registered them to the auction, they were

7       for sale to anybody.

8   Q.  Uh-huh (positive response).

9   A.  They bid them off or got together with you

10       and determined the price and went from

11       there.

12   Q.  Uh-huh (positive response).

13          But you knew you were selling these

14       cars to Cooper in Alabama; correct?

15   A.  Yes.

16   Q.  And you knew you were selling vans to

17       Cooper in Alabama?

18   A.  Yes.

19   Q.  And you knew you were selling vans to

20       Deloach in Tuscaloosa; correct?

21   A.  Correct.

22   Q.  How many vans do you estimate -- conversion

23       vans do you estimate wound up in Alabama

1    through this process where you go to the

2    auction in Atlanta and Alabama dealers come

3    over and buy them?  How many vans do you

4    estimate wound up being in Alabama --

5  A.  To put a number on it, I can't.

6  Q.  I'm sorry?

7  A.  To put a number on it, I can't.

8  Q.  More than one?

9  A.  Yes.

10  Q.  More than ten?

11  A.  Yes.

12  Q.  50?

13  A.  I don't know.

14  Q.  Less than 50?

15  A.  I don't know that.

16  Q.  Are there any records to indicate --

17  A.  None.

18  Q.  None.

19      Is Bill Deloach still in business?  Do

20    you know?

21  A.  Don't think so.

22  Q.  Okay.  Do you know if anyone has taken over

23    his business?

1   A.  Don't know.

2   Q.  When is the last time you took a van over

3       to Atlanta for sale at the auction?

4   A.  Approximately 1988.

5   Q.  1988?

6   A.  '87, '88.

7   Q.  '87, '88.

8       And in that 1987 or '88 time frame, did

9   any of these vans end up in Alabama?

10      MR. MUDD:  When you say wind up,

11          what do you mean?

12  Q.  Well, you know, did you sell any of the

13      vans to dealers in Alabama?

14      MR. MUDD:  Through the auction in

15          Atlanta?

16      MR. STEVENS:  Through the auction

17          in Atlanta.

18  A.  It would have been, yes.

19  Q.  Could have been.

20      Did you ever deal directly with any

21      dealers in Alabama?

22  A.  No.

23  Q.  All your dealings with Alabama people came

1    about through the auction in Atlanta?

2    A.  Well, they would call me afterwards and

3       purchase.

4    Q.  They would call you afterwards and

5       purchase?

6    A.  Yes.

7    Q.  Tell me how that all worked.

8    A.  They'd call me and tell me what kind of van

9       they wanted, and we would convert it for

10      them.

11   Q.  Okay.  So dealers from Alabama would call

12      you up and say I want a conversion van

13      based on plan X?

14   A.  Yes.

15   Q.  And you would convert it and ship it to

16      Alabama?

17   A.  Yes.

18   Q.  Now, is this in addition to vans that you

19      would take over to the auction and sell?

20   A.  Yes.

21   Q.  Okay.  So you were selling some vans at the

22      Atlanta auction --

23   A.  Right.

1   Q.  -- correct?

2        And I assume some dealers in Alabama

3    would come to the auction and buy your vans

4    at the auction --

5   A.  Yes.

6   Q.  -- correct?

7        Okay.  And then there were other

8    instances where dealers from Alabama would

9    call you directly and say I want a

10    conversion van based on a certain plan and

11    you would provide it to them directly?

12   A.  Yes.

13   Q.  And this was going to Alabama?

14   A.  Yes.

15   Q.  And this occurred on more than one

16    occasion?

17   A.  Yes.

18   Q.  Can you give me an estimate of many vans

19    you provided to Alabama dealers directly

20    without going --

21   A.  I can't --

22   Q.  -- through the auction?

23   A.  I can't tell you.

1    Q.   Again, would it be more than one occasion?

2    A.   Yes.

3    Q.   Yes.

4         More than ten probably?

5    A.   Probably more than ten.

6    Q.   As many as 50 maybe?

7    A.   Like I said, I can't answer that.

8    Q.   I understand.

9         And the follow-up question is are there

10        any records that would show --

11   A.   None.

12   Q.   -- at this point?

13   A.   (Witness shakes head.)

14   Q.   And why are there none at this point as far

15        as records go?

16   A.   Well, we through -- I moved from -- I sold

17        the place where we did the van conversion

18        in 2001, and we just through all that stuff

19        away.

20   Q.   So there are no records of the conversions

21        anymore?

22   A.   No.

23   Q.   You got out of the conversion business?

1   A.   Yes.

2   Q.   Why?

3   A.   No money in it.

4   Q.   Good enough reason.

5   A.   Uh-huh (positive response).

6   Q.   Can you give me the names of any dealers

7        that you dealt with directly as far as

8        delivering vans on these call-in orders as

9        you've described?

10  A.   I told you Cooper.

11  Q.   Cooper.

12  A.   And Bill Deloach.

13  Q.   And Deloach.

14       So any others that come to mind?

15  A.   None.

16  Q.   Where is Cooper located?

17  A.   Anniston, I believe.

18  Q.   Okay.  What was the relationship of Phil

19       Owens, Inc., to -- Is it Tugaloo Sports

20       Vans?

21  A.   None to Tugaloo Sports Vans.

22  Q.   What was the nature of Phil Owens'

23       conversion business?  Did you own a

1     business and Tugaloo owned a business?

2   A.   Tugaloo was just the name of the van we

3        had.

4   Q.   I understand.

5   A.   And we did business as Phil Owens Used Car,

6        Incorporated.

7   Q.   And the conversion shop was owned by Phil

8        Owens Used Cars, Incorporated?

9   A.   That's correct.

10  Q.   And the Tugaloo was the product name?

11  A.   Yes.

12  Q.   Okay.  During the time period where you

13       were operating the conversion business, did

14       you send any kind of mailings or

15       advertisements to Alabama dealers

16       soliciting business?

17  A.   Never sent none to anybody.

18  Q.   Never sent any to anybody?

19  A.   No.

20  Q.   How did the word of your business get out?

21  A.   Well, I had gone to the Atlanta Auto

22       Auction.  I missed -- It's been out there

23       36 years, and I missed about 36 sales in 36

19

1    years.  So that's where I got word of

2    mouth.

3    Q.  I see.

4        Did you ever do any print advertising

5    of any kind in Alabama?

6    A.  Never.

7    Q.  Never.

8        What about South Carolina?

9    A.  Never.

10   Q.  Never.

11       Radio or TV advertising?

12   A.  Never.

13   Q.  Was Phil Owens Used Cars, Inc., ever party

14   to a lawsuit in Alabama?

15   A.  Yes.

16   Q.  Was Tugaloo ever a party to a lawsuit in

17   Alabama?

18   A.  Tugaloo River Customs?

19   Q.  Yeah.

20   A.  No.

21   Q.  No.

22       When you say Tugaloo River Customs,

23   what entity is that?

1    A.   That's just the name of the van.

2    Q.   The name after the van?

3    A.   Uh-huh (positive response).

4    Q.   Which was actually produced by Phil Owens

5         Used Cars, Inc.?

6    A.   Correct.

7    Q.   Do you recall a case in Alabama that was

8         titled Paul Cannon versus General Motors

9         and others, including -- I believe, this

10        one included Phil Owens Used Cars as a

11        defendant.  Do you recall that case?

12   A.   Rephrase that.

13   Q.   Do you recall a case where the name of the

14        plaintiff was a Paul Cannon or the Estate

15        of a Paul Cannon?

16   A.   Never heard of it.

17   Q.   Never heard of it.

18             And I believe this case came out of

19        Tuscaloosa.  Did Phil Owens ever get sued

20        in Tuscaloosa County?

21   A.   That's where I got sued, yes.

22   Q.   What do you recall about that case?  What

23        happened?

1   A.  It was an auto accident is what that one

2      was in Tuscaloosa.

3   Q.  How did it wind up that Phil Owens Used

4      Cars, Inc., wound up being a party to that

5      case?

6   A.  My truckdriver got involved in it over

7      there.

8   Q.  Uh-huh (positive response).

9        And what happened?  Was he delivering a

10     van over there, or what happened?

11   A.  He had been to Bill Deloach, yes.

12   Q.  And he was delivering a conversion van?

13   A.  Yes.

14   Q.  And got in an accident in Alabama?

15   A.  Yes.

16   Q.  Can you recall what happened?

17   A.  Well, this little girl was going down the

18     interstate behind an eighteen-wheeler.  She

19     was already supposed to be at work at nine

20     o'clock.  This was ten minutes after nine.

21     And she did this and that, and she didn't

22     get behind my truck and that one.  The

23     eighteen-wheeler's tire marks was on the

1    right trunk and drove it up under my truck.

2  Q.  I see.

3       And your truck got -- was involved in

4    the accident?

5  A.  Yes.  The eighteen-wheeler kept going.  He

6    probably never knew he hit her.

7  Q.  But your company got sued?

8  A.  Yes.

9  Q.  Do you remember what happened to that case?

10  A.  Yes.

11  Q.  Was it resolved in some way?

12  A.  We went to trial, but we settled before the

13   jury came back.

14  Q.  Did it go to trial in Tuscaloosa County?

15  A.  Yes.

16  Q.  So you did not contest jurisdiction in that

17   case?

18  A.  Don't recall.  It was in federal court.

19  Q.  Oh, it was in federal court?

20  A.  Yes.

21  Q.  In Tuscaloosa County?

22  A.  Yes.

23       MR. MUDD:  They actually had a

1             vehicle that was on the

2             highway that was involved in

3             the accident in Alabama.  I

4             think that may be why.

5  Q.  Do you recall a case involving a Richard

6     Brewer versus Oscar Lee Harris?

7  A.  That's the case I'm speaking of.

8  Q.  That's the case you were speaking of?

9  A.  Yes.

10  Q.  All right.  And Phil Owens was a party

11     defendant in that case?

12  A.  Yes.

13  Q.  Now, this one was actually tried in federal

14     court in Alabama?

15  A.  Yes.

16  Q.  But that involved activity in the state of

17     Alabama?

18  A.  Yes.

19  Q.  But you don't have any recollection of a

20     lawsuit involving a Paul Cannon versus

21     General Motors?

22  A.  The one in Tuscaloosa is the only one I've

23     ever been in anywhere, that one instance.

1   Q.   Do you know a William Andrews?

2   A.   Yes, I know him.  William Tyler Andrews?

3   Q.   Yes, sir.

4        Who is he?

5   A.   He's right now -- He used to operate

6        Tugaloo Sports Vans.

7   Q.   Okay.  Is that a different entity from

8        the --

9   A.   It's different from me.  All together

10       different.

11  Q.   Have you been over to see the van that was

12       involved in this accident?

13  A.   No.

14  Q.   You have not.

15       Okay.  Do you recall the process that

16       would have been followed in regard to this

17       particular van, whether it came to Maypole

18       and was transferred over to your company

19       for conversion?

20  A.   According to the MSO that you have a copy

21       of, I assume, it came to Maypole and then

22       to me and then to O & M Motor Company.

23  Q.   Can you recall anything about the condition

1    of the van?

2         MR. MUDD:  For the Record, me is

3              Phil Owens Used Cars, Inc.;

4              correct?

5         THE WITNESS:  Everything is Inc.,

6              yes.

7         MR. MUDD:  Let's make sure you

8              delineate you individual from

9              your corporation.

10                  Go ahead.

11   Q.  Can you recall anything about the condition

12       of the van at the time it came to your

13       company?

14   A.  It was a seat delete van.

15   Q.  Seat delete van?

16   A.  Yes.

17   Q.  Did it have any seats in it at all?

18   A.  Cardboard seats.

19   Q.  Cardboard seats?

20   A.  Yes.

21   Q.  Were there any fixtures on the interior of

22       the van at all?

23   A.  What are you speaking of there?

1   Q.   Any kind of seats, seat belts, consoles,

2        anything behind the dash?

3               MR. MUDD:  Let me say this.  At

4                 some point, I'm going to tell

5                 him, you know, this is not

6                 within the scope.  I know you

7                 want to get the information,

8                 and I'm not here to [272]

9                 that.  But at the same time, I

10                have not prepared this witness

11                to give a full deposition.  I

12                want to -- I would like to

13                focus on the jurisdictional

14                issues.

15              MR. STEVENS:  Well, I'm going to

16                ask questions until you tell

17                me to stop.

18              MR. MUDD:  Well, don't answer that

19                one, because I don't see that

20                it has any relationship.  Now,

21                if you want to ask him if the

22                seats came from Alabama, you

23                know, or -- But I'm not going

1           to let him answer general

2           conversion too far astray.

3           MR. STEVENS:  That's fine.

4    Q.  Well, since Bill brought that subject up

5        you had to get components from somewhere

6        for the conversion process; correct?

7    A.  Yes.

8    Q.  You had to get seats and seat belts and all

9        of those things?

10   A.  Yes.

11   Q.  Where did they come from?

12   A.  I can't tell you that either.

13   Q.  Okay.  Do you have any records at this

14       point?

15   A.  No records whatsoever of the van business,

16       no, I don't.

17   Q.  Did you sell the conversion business or

18       just shut it down?

19   A.  Just shut it down.

20   Q.  Just shut it down completely?

21   A.  General Motors got to regulating it in 1988

22       and I quit in '92.

23   Q.  Got to be where it was no fun?

1   A.   No money in it.

2   Q.   Okay.  When you say General Motors got to

3        regulating it, what do you mean?

4   A.   They approved us at upfitters, but I had to

5        sell back to a Chevrolet dealer.  I could

6        sell to nobody else.  Prior to 1988, I

7        could sell to whoever I wanted to.

8   Q.   Did you ever ask have any contact with

9        General Motors regarding the conversion

10        process prior to their involvement in '88

11        or --

12   A.   Never.

13   Q.   Never.

14        No kind of an agreement with them?

15   A.   Never.

16        MR. MUDD:  Kind of going afield

17            but ...

18   Q.   I take it none of the components that went

19        into the conversion process came from

20        Alabama?

21   A.   Not to my knowledge.

22   Q.   Not to your knowledge.

23        And just so I can make sure that we

1     cover the waterfront with you, other than

2     the MSO that we talked about that I've

3     already got, you don't have any paper

4     records at all at this point?

5  A.  No.

6          MR. MUDD:  The only document we

7            have that references this

8            vehicle is this piece of

9            paper, and it simply is off a

10           ledger sheet that shows this

11           car came -- this van came

12           through there.

13         MR. STEVENS:  Is that something we

14           can mark?

15         MR. MUDD:  Yes.  It's the only

16           copy I've got.  I'd like to

17           get a copy while we are here.

18         (Plaintiff's Exhibit 1 was marked

19           for identification.)

20         (Off-the-Record discussion.)

21  A.  On six -- It looks like 6/3, of '05, sold

22      it to O & M Motor Company and got the VIN

23      number and it came from Maypole Chevrolet.

1   Q.  All right.  Now, as far as O & M Motor

2        Company is concerned, they're located in

3        Columbus, Georgia; right?

4   A.  Correct.

5   Q.  And that's right on the Alabama line?

6   A.  Right.

7   Q.  Had you sold any other vans to O & M?

8   A.  Yes.

9   Q.  Prior to this one?

10  A.  Yes, I'm sure.

11  Q.  You're sure of that?

12  A.  There's two or three noted on there.

13  Q.  All right.  So was O & M sort of a regular

14       customer of yours?

15  A.  Somewhat.

16  Q.  When you say somewhat, can you give me any

17       idea of how many vans O & M would order

18       from you during a year?  I'm sure it could

19       vary some.

20  A.  I don't know.  I can't answer that.

21  Q.  Other than this one ledger sheet, would

22       there be any other records around showing

23       sells to O & M for conversion vans?  Are

1    there other ledger sheets like that one?

2    A.  I don't know.

3    Q.  Is this the only one you could find?

4    A.  This is the only one I could find.

5    Q.  There are no other ledger sheets anywhere?

6    A.  There could be.  I don't know.  We had

7    hundreds of ledger sheets.

8    Q.  Did this ledger sheet that you've got here

9    and we've got marked as an exhibit -- did

10    it come out of a book that was a ledger

11    book?

12            (Off-the-Record discussion.)

13    A.  It probably is a big ledger book when it's

14    found, but this is the only one pertaining

15    to that van.

16    Q.  I understand that.

17            MR. MUDD:  He wants to know if you

18            have other ledger sheets where

19            this came from, collection of

20            ledger sheets in some bound

21            document, or whatever format

22            it's in.

23    Q.  Yes.  Just other ledger sheets.  There are

32

1      others like this; right?

2   A.  Yes, like this.

3   Q.  And I assume on some of those other ledger

4      sheets it's going to show vans going to

5      O & M Used Cars in Columbus; correct?

6   A.  If they bought vans, yes.

7   Q.  If they bought vans, yes.

8         And it would be expected by you,

9      wouldn't it, that a dealer in Columbus,

10      Georgia might well sell one of your vans to

11      somebody in Alabama?

12   A.  I have no idea where he'd sell it.

13   Q.  Exactly.  He might well sell it right

14      across the river in Alabama?

15   A.  Being as close as he was, yes.

16   Q.  Same deal with --

17   A.  South Carolina.

18   Q.  -- the location -- Might wind up in South

19      Carolina?

20   A.  Yes.

21   Q.  And that's not something that would be

22      unexpected; correct?

23   A.  No.

1   Q.   As a matter of fact, you'd expect that to

2        happen; right?

3   A.   Possibly.

4   Q.   Yes.

5            You've never done any radio or TV

6        advertising in Alabama?

7   A.   Never.

8   Q.   Other than that one lawsuit, you don't have

9        any recollection of any other suit in

10       Alabama?

11  A.   It's the only lawsuit I've ever had.

12  Q.   The only one you've ever had.  Okay.

13           Have you ever tried or ever had to make

14       any type of repossession outside of

15       Georgia?

16  A.   No.  I'm not in the finance business, so I

17       don't have no repossessions.

18  Q.   All right.  Own any property outside the

19       state of Georgia?

20  A.   No.

21  Q.   Phil Owens Used Cars, Inc., own any

22       property outside the state of Georgia?

23  A.   No.

1  Q.  And you never done any commercial or print

2     advertising outside Georgia?

3  A.  No.

4  Q.  None in Alabama?

5  A.  No.

6  Q.  All right.  That's all.  I appreciate it,

7     sir.

8  A.  Thank you.

9          MR. MUDD:  Anybody have a

10            question?

11         MR. PFLAUM:  None here.

12         MS. RODGERS:  Nothing here.

13         MR. NIX:  Nothing here.

14         MR. MUDD:  Thank you, guys.

15     * * * * * * * * * * * *

16     FURTHER DEPONENT SAITH NOT

17     * * * * * * * * * * * *

18

19

20

21

22

23

1        REPORTER'S CERTIFICATE

2  STATE OF ALABAMA:

3  ELMORE COUNTY:

4      I, Haley A. Phillips, Certified Shorthand

5  Reporter and Commissioner for the State of Alabama

6  at Large, do hereby certify that I reported the

7  deposition of:

8        JUDD WORLEY

9  who was first duly sworn by me to speak the truth,

10  the whole truth and nothing but the truth, in the

11  matter of:

12        HARRISON JOHNSON, JR., et al.,

13        Plaintiffs,

14        vs.

15        BRIDGESTONE FIRESTONE NORTH

16        AMERICAN TIRE, LLC, et al.,

17        Defendants.

18        In The U.S. District Court

19        For the Middle District of Alabama

20        Northern Division

21        Case Number 2:06-CV-290-SRW

22  on Wednesday, April 19, 2006.

23      The foregoing 34 computer-printed pages

1  contain a true and correct transcript of the

2  examination of said witness by counsel for the

3  parties set out herein.  The reading and signing of

4  same is hereby waived.

5      I further certify that I am neither of kin

6  nor of counsel to the parties to said cause nor in

7  any manner interested in the results thereof.

8      This [] day of May 2006.

9

10

11  _____

12      Haley A. Phillips, Certified
        Shorthand Reporter and
13       Commissioner for the State
        of Alabama at Large

14

15

16

17

18

19

20

21

22

23