

1

IN THE UNITED STATES DISTRICT COURT

FOR THE MIDDLE DISTRICT OF ALABAMA

NORTHERN DIVISION


HARRISON JOHNSON, JR., et al.,

     Plaintiffs,

Vs.                                    CIVIL ACTION NO.
                                       2:06-CV-290-SRW
BRIDGESTONE FIRESTONE NORTH
AMERICAN TIRE, LLC, et al.,

     Defendants.


* * * * * * * * * * * *

**DEPOSITION OF PHIL OWENS**, taken pursuant to

stipulation and agreement before Haley A. Phillips,

Certified Shorthand Reporter, and Commissioner for

the State of Alabama at Large, at Maypole

Chevrolet, 1223 South Big A Road, Taccoa, Georgia,

on Wednesday, April 19, 2006, commencing at

approximately 2:00 p.m. EST.


* * * * * * * * * * * *

2

1                          **APPEARANCES**

2

3    **FOR THE PLAINTIFF:**

4    Blaine C. Stevens, Esq.
     Strickland, Chancellor & Kendall
5    Attorneys at Law
     420 South Lawrence
6    Montgomery, Alabama   36104

7    **FOR THE DEFENDANT:**

8    Roger S. Morrow, Esq.
     Morrow, Romine & Pearson
9    Attorneys at Law
     122 South Hull Street
10   Montgomery, Alabama   36104

11   William A. Mudd, Esq.
     Sadler Sullivan, P.C.
12   Attorneys at Law
     Suite 2500
13   420 North 20th Street
     Birmingham, Alabama   35203

14
     Kenneth M. Perry, Esq.
15   Bradley, Arant, Rose & White
     Attorneys at Law
16   1819 5th Avenue North
     Birmingham, Alabama   35203

17
     Keith J. Pflaum, Esq. (via telephone)
18   Porterfield, Harper, Mills & Motlow
     Attorneys at Law
19   Suite 600
     22 Inverness Center Parkway
20   Birmingham, Alabama   35253

21   Andrew S. Nix, Esq. (via telephone)
     Lightfoot, Franklin & White
22   Attorneys at Law
     400 20th Street North
23   Birmingham, Alabama   35203

3

1                    **APPEARANCES (cont'd)**

2    Rachel Rodgers, Esq. (via telephone)
     Pillsbury, Winthrop, Shaw & Pittman
3    Attorneys at Law
     2 Houston Center
4    909 Fannin, 22nd Floor
     Houston, Texas  77010

5                * * * * * * * * * * *

6
                    **EXAMINATION INDEX**
7
         BY MR. STEVENS . . . . . . . . . .    6
8

9                **PLAINTIFF'S EXHIBIT INDEX**

10   1    Ledger Sheet for June 1985                29

11               * * * * * * * * * * *

12

13

14

15

16

17

18

19

20

21

22

23

1                          **STIPULATION**

2           It is hereby stipulated and agreed by and

3      between counsel representing the parties that the

4      deposition of **PHIL OWENS** is taken pursuant to the

5      Federal Rules of Civil Procedure and that said

6      deposition may be taken before Haley A. Phillips,

7      Certified Shorthand Reporter, and Commissioner for

8      the State of Alabama at Large, without the

9      formality of a commission, that objections to

10     questions other than objections as to the form of

11     the question need not be made at this time but may

12     be reserved for a ruling at such time as the said

13     deposition may be offered in evidence or used for

14     any other purpose by either party provided for by

15     the Statute.

16          It is further stipulated and agreed by and

17     between counsel representing the parties in this

18     case that the filing of said deposition is hereby

19     waived and may be introduced at the trial of this

20     case or used in any other manner by either party

21     hereto provided for by the Statute regardless of

22     the waiving of the filing of the same.

23          It is further stipulated and agreed by and

1    between the parties hereto and the witness that the

2    signature of the witness to this deposition is

3    hereby waived.

4            * * * * * * * * * * * *

5                      **PHIL OWENS**

6        The witness, after having first been duly

7    sworn to speak the truth, the whole truth and

8    nothing but the truth testified as follows:

9                        MR. MUDD:  And before we start, I

10                       have objected to a certain

11                       aspect of the scope of the

12                       deposition.  I think we have

13                       the same agreement that you've

14                       got with Mr. Morrow with

15                       regard to our jurisdictional

16                       defense, which will be six

17                       defenses.  And I think we've

18                       already got a structural

19                       agreement on the scope of the

20                       examination regarding those

21                       defenses.  But we'll go

22                       forward and see the best we

23                       can do.

6

<b>EXAMINATION</b>

**BY MR. STEVENS:**

Q.   Give us your name, please.

A.   Phil David Owens.

Q.   Mr. Owens, I'm Blaine Stevens.  I represent
     the plaintiffs in this case.  If you get a
     question from me that you don't understand
     for any reason, just stop me and I'll do my
     best to try to clear it up for you.  You
     own a company called Phil Owens Used Cars?

A.   Incorporated.

Q.   Incorporated.

     How long have you been in business as
     Phil Owens Used Cars, Inc.?

A.   Since 1975.

Q.   And just for the Record, what is the
     business of Phil Owens Used Cars, Inc.?
     What do y'all do?

A.   We are in the used car business from '75.

Q.   On through today?

A.   Uh-huh (positive response).

Q.   Do you ever sell new vehicles?

A.   Occasionally.

1   Q.   Occasionally.

2        Conversion vans.  Did you ever sell

3        conversion vans?

4   A.   Yes.

5   Q.   Were those sold as new vehicles sometimes?

6   A.   It would have to be sold -- You've got an

7        MSO with it, but you didn't get first

8        ownership.  I was the first ownership on an

9        MSO.

10  Q.   Tell me what the MSO is.  What is that?

11       That's manufacturer's statement of origin?

12  A.   That's correct.

13  Q.   Okay.  Let me back up and get a little more

14       background from you, please, sir, before we

15       get into all that.  As far as Phil Owens'

16       business is concerned, do -- have you ever

17       done business with people in Alabama?

18  A.   Yes.

19  Q.   You have.

20       What circumstances have you done

21       business in Alabama?

22  A.   Well, I first learned of Alabama dealers

23       through my van conversion business through

1       the Atlanta Auto Auction in Atlanta.

2  Q.  Right.

3  A.  And they relayed -- bought vans from me at

4       the Atlanta Auto Auction.  And then they

5       would give me calls when they need them,

6       and we would take them to them.

7  Q.  All right.  Just so I understand, your

8       contacts of Alabama dealt with your

9       conversion van business, sales of

10      conversion vans; correct?

11  A.  I had no agents over there, no.

12  Q.  I understand that.  I understand that.

13      But your contacts with people in

14      Alabama came about through the conversion

15      van business; right?

16  A.  True.

17  Q.  True.

18      All right.  And as I understand it, you

19      were taking vans over to the auction in

20      Atlanta?

21  A.  Right.

22  Q.  And there were people from Alabama

23      dealerships, coming to the auction to buy

1         vans?

2    A.   Right.

3    Q.   And you had personal contact with these

4         people from Alabama who were buying vans

5         there at the auction?

6    A.   There at the auction, yes.

7    Q.   Who were you dealing with?  Can you give me

8         the names of any people you were dealing

9         with?

10   A.   Well, Cooper Chevrolet and Bill Deloach

11        Lincoln Mercury.  And then there's probably

12        some more, but I don't recall no more.

13   Q.   How often would you go over to the auction

14        and deliver vans to people in Alabama,

15        these dealerships you talk about, Cooper --

16           And who were the others?

17   A.   Bill Deloach Lincoln Mercury in --

18   Q.   Bill Deloach.

19   A.   -- Tuscaloosa.

20   Q.   Cooper and Bill Deloach.  Anybody else you

21        can recall?

22   A.   Not recall, I can't.

23   Q.   But you do recall Cooper and Deloach?

10

1   A.   Uh-huh (positive response).

2   Q.   How often would you go over to Atlanta and

3       see Cooper or Deloach?

4   A.   I don't know exactly when.

5   Q.   More than one occasion, though?

6   A.   Oh, yes.

7   Q.   And Cooper and Deloach came over here

8       specifically to buy vans to take back to

9       Alabama for resale?

10   A.   At the auction they would buy cars too.

11   Q.   Uh-huh (positive response).  I understand

12       that.

13   A.   It wasn't just for what I had, no.

14   Q.   But you specifically took conversion vans

15       over there for sale?

16   A.   Yes.

17   Q.   And you specifically took conversion vans

18       over there to sell to these particular

19       dealers in Alabama; right?

20   A.   Not --

21            MR. MUDD:  Just -- Let me -- Over

22               there, we're talking Atlanta,

23               Georgia auction?

1    MR. STEVENS:  Atlanta.

2         MR. MUDD:  Because over there is

3              kind of vague.  But go ahead.

4         MR. STEVENS:  I understand.

5  A.   When we took them to the auction and

6       registered them to the auction, they were

7       for sale to anybody.

8  Q.   Uh-huh (positive response).

9  A.   They bid them off or got together with you

10      and determined the price and went from

11      there.

12 Q.   Uh-huh (positive response).

13          But you knew you were selling these

14      cars to Cooper in Alabama; correct?

15 A.   Yes.

16 Q.   And you knew you were selling vans to

17      Cooper in Alabama?

18 A.   Yes.

19 Q.   And you knew you were selling vans to

20      Deloach in Tuscaloosa; correct?

21 A.   Correct.

22 Q.   How many vans do you estimate -- conversion

23      vans do you estimate wound up in Alabama

12

```
 1          through this process where you go to the

 2          auction in Atlanta and Alabama dealers come

 3          over and buy them?  How many vans do you

 4          estimate wound up being in Alabama --

 5     A.   To put a number on it, I can't.

 6     Q.   I'm sorry?

 7     A.   To put a number on it, I can't.

 8     Q.   More than one?

 9     A.   Yes.

10     Q.   More than ten?

11     A.   Yes.

12     Q.   50?

13     A.   I don't know.

14     Q.   Less than 50?

15     A.   I don't know that.

16     Q.   Are there any records to indicate --

17     A.   None.

18     Q.   None.

19              Is Bill Deloach still in business?  Do

20          you know?

21     A.   Don't think so.

22     Q.   Okay.  Do you know if anyone has taken over

23          his business?
```

13

1    A.    Don't know.

2    Q.    When is the last time you took a van over

3          to Atlanta for sale at the auction?

4    A.    Approximately 1988.

5    Q.    1988?

6    A.    '87, '88.

7    Q.    '87, '88.

8          And in that 1987 or '88 time frame, did

9          any of these vans end up in Alabama?

10                   MR. MUDD:  When you say wind up,

11                   what do you mean?

12   Q.    Well, you know, did you sell any of the

13         vans to dealers in Alabama?

14                   MR. MUDD:  Through the auction in

15                   Atlanta?

16                   MR. STEVENS:  Through the auction

17                   in Atlanta.

18   A.    It would have been, yes.

19   Q.    Could have been.

20         Did you ever deal directly with any

21         dealers in Alabama?

22   A.    No.

23   Q.    All your dealings with Alabama people came

14

1      about through the auction in Atlanta?

2   A.  Well, they would call me afterwards and

3      purchase.

4   Q.  They would call you afterwards and

5      purchase?

6   A.  Yes.

7   Q.  Tell me how that all worked.

8   A.  They'd call me and tell me what kind of van

9      they wanted, and we would convert it for

10      them.

11  Q.  Okay.  So dealers from Alabama would call

12      you up and say I want a conversion van

13      based on plan X?

14  A.  Yes.

15  Q.  And you would convert it and ship it to

16      Alabama?

17  A.  Yes.

18  Q.  Now, is this in addition to vans that you

19      would take over to the auction and sell?

20  A.  Yes.

21  Q.  Okay.  So you were selling some vans at the

22      Atlanta auction --

23  A.  Right.

1    Q.    -- correct?

2          And I assume some dealers in Alabama

3          would come to the auction and buy your vans

4          at the auction --

5    A.    Yes.

6    Q.    -- correct?

7          Okay.  And then there were other

8          instances where dealers from Alabama would

9          call you directly and say I want a

10         conversion van based on a certain plan and

11         you would provide it to them directly?

12   A.    Yes.

13   Q.    And this was going to Alabama?

14   A.    Yes.

15   Q.    And this occurred on more than one

16         occasion?

17   A.    Yes.

18   Q.    Can you give me an estimate of how many

19         vans you provided to Alabama dealers

20         directly without going --

21   A.    I can't --

22   Q.    -- through the auction?

23   A.    I can't tell you.

16

1    Q.    Again, would it be more than one occasion?

2    A.    Yes.

3    Q.    Yes.

4          More than ten probably?

5    A.    Probably more than ten.

6    Q.    As many as 50, maybe?

7    A.    Like I said, I can't answer that.

8    Q.    I understand.

9          And the follow-up question is are there

10         any records that would show --

11   A.    None.

12   Q.    -- at this point?

13   A.    (Witness shakes head.)

14   Q.    And why are there none at this point as far

15         as records go?

16   A.    Well, we threw -- I moved from -- I sold

17         the place where we did the van conversion

18         in 2001, and we just threw all that stuff

19         away.

20   Q.    So there are no records of the conversions

21         anymore?

22   A.    No.

23   Q.    You got out of the conversion business?

1    A.    Yes.

2    Q.    Why?

3    A.    No money in it.

4    Q.    Good enough reason.

5    A.    Uh-huh (positive response).

6    Q.    Can you give me the names of any dealers

7          that you dealt with directly as far as

8          delivering vans on these call-in orders as

9          you've described?

10   A.    I told you Cooper.

11   Q.    Cooper.

12   A.    And Bill Deloach.

13   Q.    And Deloach.

14         So any others that come to mind?

15   A.    None.

16   Q.    Where is Cooper located?

17   A.    Anniston, I believe.

18   Q.    Okay.  What was the relationship of Phil

19         Owens, Inc., to -- Is it Tugaloo Sports

20         Vans?

21   A.    None to Tugaloo Sports Vans.

22   Q.    What was the nature of Phil Owens'

23         conversion business?  Did you own a

1          business and Tugaloo owned a business?

2    A.    Tugaloo was just the name of the van we

3          had.

4    Q.    I understand.

5    A.    And we did business as Phil Owens Used

6          Cars, Incorporated.

7    Q.    And the conversion shop was owned by Phil

8          Owens Used Cars, Incorporated?

9    A.    That's correct.

10   Q.    And the Tugaloo was the product name?

11   A.    Yes.

12   Q.    Okay.  During the time period where you

13         were operating the conversion business, did

14         you send any kind of mailings or

15         advertisements to Alabama dealers

16         soliciting business?

17   A.    Never sent none to anybody.

18   Q.    Never sent any to anybody?

19   A.    No.

20   Q.    How did the word of your business get out?

21   A.    Well, I had gone to the Atlanta Auto

22         Auction.  I missed -- It's been out there

23         36 years, and I missed about 36 sales in 36

19

```
 1          years.  So that's where I got word of

 2          mouth.

 3     Q.   I see.

 4               Did you ever do any print advertising

 5          of any kind in Alabama?

 6     A.   Never.

 7     Q.   Never.

 8               What about South Carolina?

 9     A.   Never.

10     Q.   Never.

11               Radio or TV advertising?

12     A.   Never.

13     Q.   Was Phil Owens Used Cars, Inc., ever party

14          to a lawsuit in Alabama?

15     A.   Yes.

16     Q.   Was Tugaloo ever a party to a lawsuit in

17          Alabama?

18     A.   Tugaloo River Customs?

19     Q.   Yeah.

20     A.   No.

21     Q.   No.

22               When you say Tugaloo River Customs,

23          what entity is that?
```

20

1   A.   That's just the name of the van.

2   Q.   The name of the van?

3   A.   Uh-huh (positive response).

4   Q.   Which was actually produced by Phil Owens

5        Used Cars, Inc.?

6   A.   Correct.

7   Q.   Do you recall a case in Alabama that was

8        titled Paul Cannon versus General Motors

9        and others, including -- I believe, this

10       one included Phil Owens Used Cars as a

11       defendant.  Do you recall that case?

12  A.   Rephrase that.

13  Q.   Do you recall a case where the name of the

14       plaintiff was a Paul Cannon or the Estate

15       of a Paul Cannon?

16  A.   Never heard of it.

17  Q.   Never heard of it.

18           And I believe this case came out of

19       Tuscaloosa.  Did Phil Owens ever get sued

20       in Tuscaloosa County?

21  A.   That's where I got sued, yes.

22  Q.   What do you recall about that case?  What

23       happened?

21

1   A.   It was an auto accident is what that one

2        was in Tuscaloosa.

3   Q.   How did it wind up that Phil Owens Used

4        Cars, Inc., wound up being a party to that

5        case?

6   A.   My truckdriver got involved in it over

7        there.

8   Q.   Uh-huh (positive response).

9             And what happened?  Was he delivering a

10        van over there, or what happened?

11  A.   He had been to Bill Deloach, yes.

12  Q.   And he was delivering a conversion van?

13  A.   Yes.

14  Q.   And got in an accident in Alabama?

15  A.   Yes.

16  Q.   Can you recall what happened?

17  A.   Well, this little girl was going down the

18        interstate behind an eighteen-wheeler.  She

19        was already supposed to be at work at nine

20        o'clock.  This was ten minutes after nine.

21        And she did this and that, and she didn't

22        get behind my truck and that one.  The

23        eighteen-wheeler's tire marks was on the

22

1          right trunk and drove it up under my truck.

2    Q.    I see.

3          And your truck got -- was involved in

4          the accident?

5    A.    Yes.  The eighteen-wheeler kept going.  He

6          probably never knew he hit her.

7    Q.    But your company got sued?

8    A.    Yes.

9    Q.    Do you remember what happened to that case?

10   A.    Yes.

11   Q.    Was it resolved in some way?

12   A.    We went to trial, but we settled before the

13         jury came back.

14   Q.    Did it go to trial in Tuscaloosa County?

15   A.    Yes.

16   Q.    So you did not contest jurisdiction in that

17         case?

18   A.    Don't recall.  It was in federal court.

19   Q.    Oh, it was in federal court?

20   A.    Yes.

21   Q.    In Tuscaloosa County?

22   A.    Yes.

23              MR. MUDD:  They actually had a

23

1          vehicle that was on the

2          highway that was involved in

3          the accident in Alabama.  I

4          think that may be why.

5   Q.   Do you recall a case involving a Richard

6        Brewer versus Oscar Lee Harris?

7   A.   That's the case I'm speaking of.

8   Q.   That's the case you were speaking of?

9   A.   Yes.

10  Q.   All right.  And Phil Owens was a party

11       defendant in that case?

12  A.   Yes.

13  Q.   Now, this one was actually tried in federal

14       court in Alabama?

15  A.   Yes.

16  Q.   But that involved activity in the state of

17       Alabama?

18  A.   Yes.

19  Q.   But you don't have any recollection of a

20       lawsuit involving a Paul Cannon versus

21       General Motors?

22  A.   The one in Tuscaloosa is the only one I've

23       ever been in anywhere, that one instance.

1    Q.    Do you know a William Andrews?

2    A.    Yes, I know him.  William Tyler Andrews?

3    Q.    Yes, sir.

4          Who is he?

5    A.    He's right now -- He used to operate

6          Tugaloo Sports Vans.

7    Q.    Okay.  Is that a different entity from

8          the --

9    A.    It's different from me.  All together

10         different.

11   Q.    Have you been over to see the van that was

12         involved in this accident?

13   A.    No.

14   Q.    You have not.

15         Okay.  Do you recall the process that

16         would have been followed in regard to this

17         particular van, whether it came to Maypole

18         and was transferred over to your company

19         for conversion?

20   A.    According to the MSO that you have a copy

21         of, I assume, it came to Maypole and then

22         to me and then to O & M Motor Company.

23   Q.    Can you recall anything about the condition

25

```
1           of the van?
2                    MR. MUDD:  For the Record, me is
3                         Phil Owens Used Cars, Inc.;
4                         correct?
5                    THE WITNESS:  Everything is Inc.,
6                         yes.
7                    MR. MUDD:  Let's make sure you
8                         delineate you individually
9                         from your corporation.
10                        Go ahead.
11   Q.     Can you recall anything about the condition
12          of the van at the time it came to your
13          company?
14   A.     It was a seat delete van.
15   Q.     Seat delete van?
16   A.     Yes.
17   Q.     Did it have any seats in it at all?
18   A.     Cardboard seats.
19   Q.     Cardboard seats?
20   A.     Yes.
21   Q.     Were there any fixtures on the interior of
22          the van at all?
23   A.     What are you speaking of there?
```

1   Q.    Any kind of seats, seat belts, consoles,

2         anything behind the dash?

3                        MR. MUDD:  Let me say this.  At

4                        some point, I'm going to tell

5                        him, you know, this is not

6                        within the scope.  I know you

7                        want to get the information,

8                        and I'm not here to thwart

9                        that.  But at the same time, I

10                       have not prepared this witness

11                       to give a full deposition.  I

12                       want to -- I would like to

13                       focus on the jurisdictional

14                       issues.

15                       MR. STEVENS:  Well, I'm going to

16                       ask questions until you tell

17                       me to stop.

18                       MR. MUDD:  Well, don't answer that

19                       one, because I don't see that

20                       it has any relationship.  Now,

21                       if you want to ask him if the

22                       seats came from Alabama, you

23                       know, or -- But I'm not going

1                       to let him answer general

2                       conversion too far astray.

3              MR. STEVENS:  That's fine.

4    Q.  Well, since Bill brought that subject up,

5        you had to get components from somewhere

6        for the conversion process; correct?

7    A.  Yes.

8    Q.  You had to get seats and seat belts and all

9        of those things?

10   A.  Yes.

11   Q.  Where did they come from?

12   A.  I can't tell you that either.

13   Q.  Okay.  Do you have any records at this

14       point?

15   A.  No records whatsoever of the van business,

16       no, I don't.

17   Q.  Did you sell the conversion business or

18       just shut it down?

19   A.  Just shut it down.

20   Q.  Just shut it down completely?

21   A.  General Motors got to regulating it in 1988

22       and I quit in '92.

23   Q.  Got to be where it was no fun?

28

1    A.    No money in it.

2    Q.    Okay.  When you say General Motors got to

3          regulating it, what do you mean?

4    A.    They approved us at upfitters, but I had to

5          sell back to a Chevrolet dealer.  I could

6          sell to nobody else.  Prior to 1988, I

7          could sell to whoever I wanted to.

8    Q.    Did you ever have any contact with General

9          Motors regarding the conversion process

10         prior to their involvement in '88 or --

11   A.    Never.

12   Q.    Never.

13         No kind of an agreement with them?

14   A.    Never.

15              MR. MUDD:  Kind of going afield

16                 but ...

17   Q.    I take it none of the components that went

18         into the conversion process came from

19         Alabama?

20   A.    Not to my knowledge.

21   Q.    Not to your knowledge.

22         And just so I can make sure that we

23         cover the waterfront with you, other than

1        the MSO that we talked about that I've

2        already got, you don't have any paper

3        records at all at this point?

4    A.   No.

5                   MR. MUDD:  The only document we

6                   have that references this

7                   vehicle is this piece of

8                   paper, and it simply is off a

9                   ledger sheet that shows this

10                  car came -- this van came

11                  through there.

12                  MR. STEVENS:  Is that something we

13                  can mark?

14                  MR. MUDD:  Yes.  It's the only

15                  copy I've got.  I'd like to

16                  get a copy while we are here.

17                  (Plaintiff's Exhibit 1 was marked

18                  for identification.)

19                  (Off-the-Record discussion.)

20   A.   On six -- It looks like 6/3 of '05, sold it

21        to O & M Motor Company and got the VIN

22        number and it came from Maypole Chevrolet.

23   Q.   All right.  Now, as far as O & M Motor

```
 1           Company is concerned, they're located in

 2           Columbus, Georgia; right?

 3    A.     Correct.

 4    Q.     And that's right on the Alabama line?

 5    A.     Right.

 6    Q.     Had you sold any other vans to O & M?

 7    A.     Yes.

 8    Q.     Prior to this one?

 9    A.     Yes, I'm sure.

10    Q.     You're sure of that?

11    A.     There's two or three noted on there.

12    Q.     All right.  So was O & M sort of a regular

13           customer of yours?

14    A.     Somewhat.

15    Q.     When you say somewhat, can you give me any

16           idea of how many vans O & M would order

17           from you during a year?  I'm sure it could

18           vary some.

19    A.     I don't know.  I can't answer that.

20    Q.     Other than this one ledger sheet, would

21           there be any other records around showing

22           sales to O & M for conversion vans?  Are

23           there other ledger sheets like that one?
```

1    A.    I don't know.

2    Q.    Is this the only one you could find?

3    A.    This is the only one I could find.

4    Q.    There are no other ledger sheets anywhere?

5    A.    There could be.  I don't know.  We had

6          hundreds of ledger sheets.

7    Q.    Did this ledger sheet that you've got here

8          and we've got marked as an exhibit -- did

9          it come out of a book that was a ledger

10         book?

11               (Off-the-Record discussion.)

12   A.    It probably is a big ledger book when it's

13         bound, but this is the only one pertaining

14         to that van.

15   Q.    I understand that.

16               MR. MUDD:  He wants to know if you

17                    have other ledger sheets where

18                    this came from, collection of

19                    ledger sheets in some bound

20                    document, or whatever format

21                    it's in.

22   Q.    Yes.  Just other ledger sheets.  There are

23         others like this; right?

```
 1    A.    Yes, like this.

 2    Q.    And I assume on some of those other ledger

 3          sheets it's going to show vans going to

 4          O & M Used Cars in Columbus; correct?

 5    A.    If they bought vans, yes.

 6    Q.    If they bought vans, yes.

 7                And it would be expected by you,

 8          wouldn't it, that a dealer in Columbus,

 9          Georgia might well sell one of your vans to

10          somebody in Alabama?

11    A.    I have no idea where he'd sell it.

12    Q.    Exactly.  He might well sell it right

13          across the river in Alabama?

14    A.    Being as close as he was, yes.

15    Q.    Same deal with --

16    A.    South Carolina.

17    Q.    -- the location -- Might wind up in South

18          Carolina?

19    A.    Yes.

20    Q.    And that's not something that would be

21          unexpected; correct?

22    A.    No.

23    Q.    As a matter of fact, you'd expect that to
```

1        happen; right?

2   A.   Possibly.

3   Q.   Yes.

4        You've never done any radio or TV

5        advertising in Alabama?

6   A.   Never.

7   Q.   Other than that one lawsuit, you don't have

8        any recollection of any other suit in

9        Alabama?

10  A.   It's the only lawsuit I've ever had.

11  Q.   The only one you've ever had.  Okay.

12       Have you ever tried or ever had to make

13       any type of repossession outside of

14       Georgia?

15  A.   No.  I'm not in the finance business, so I

16       don't have no repossessions.

17  Q.   All right.  Own any property outside the

18       state of Georgia?

19  A.   No.

20  Q.   Phil Owens Used Cars, Inc., own any

21       property outside the state of Georgia?

22  A.   No.

23  Q.   And you have never done any commercial or

34

1          print advertising outside Georgia?

2    A.    No.

3    Q.    None in Alabama?

4    A.    No.

5    Q.    All right.  That's all.  I appreciate it,

6          sir.

7    A.    Thank you.

8                    MR. MUDD:  Anybody have a

9                       question?

10                   MR. PFLAUM:  None here.

11                   MS. RODGERS:  Nothing here.

12                   MR. NIX:  Nothing here.

13                   MR. MUDD:  Thank you, guys.

14              * * * * * * * * * * * *

15              FURTHER DEPONENT SAITH NOT

16              * * * * * * * * * * * *

17

18

19

20

21

22

23

1                    REPORTER'S CERTIFICATE

2    STATE OF ALABAMA:

3    ELMORE COUNTY:

4          I, Haley A. Phillips, Certified Shorthand

5    Reporter and Commissioner for the State of Alabama

6    at Large, do hereby certify that I reported the

7    deposition of:

8                         **PHIL OWENS**

9    who was first duly sworn by me to speak the truth,

10   the whole truth and nothing but the truth, in the

11   matter of:

12                    HARRISON JOHNSON, JR., et al.,

13                    Plaintiffs,

14                    vs.

15                    BRIDGESTONE FIRESTONE NORTH

16                    AMERICAN TIRE, LLC, et al.,

17                    Defendants.

18                    In The U.S. District Court

19                    For the Middle District of Alabama

20                    Northern Division

21                    Case Number 2:06-CV-290-SRW

22   on Wednesday, April 19, 2006.

23          The foregoing 34 computer-printed pages

1    contain a true and correct transcript of the

2    examination of said witness by counsel for the

3    parties set out herein.    The reading and signing of

4    same is hereby waived.

5              I further certify that I am neither of kin

6    nor of counsel to the parties to said cause nor in

7    any manner interested in the results thereof.

8              This 10th day of May 2006.

9

10

11

12                        _____
                          Haley A. Phillips, Certified
                          Shorthand Reporter and
13                        Commissioner for the State
                          of Alabama at Large

14

15

16

17

18

19

20

21

22

23