IN THE UNITED STATES DISTRICT COURT
FOR THE MIDDLE DISTRICT OF ALABAMA
NORTHERN DIVISION

| | |
|---|---|
| HARRISON JOHNSON, JR., et al., ) | |
| ) | |
|     Plaintiffs, ) | |
| ) | |
| v. ) | CIVIL ACTION NUMBER: |
| ) | 2:06CV00290-MEF |
| BRIDGESTONE FIRESTONE NORTH ) | |
| AMERICAN TIRE, LLC, et al., ) | |
| ) | |
|     Defendants. ) | |
| ) | |

**BRIDGESTONE FIRESTONE NORTH AMERICAN TIRE, LLC'S
RESPONSE TO PLAINTIFFS' MOTION FOR INSPECTION OF
PREMISES**

Bridgestone Firestone North American Tire, LLC ("Firestone") previously noticed its intent to respond to plaintiffs' motion to inspect the plant in which the subject tire was manufactured once it had been afforded an opportunity to inspect the subject tire and confirm its identity. Having had such an opportunity, Firestone now requests that the Court deny plaintiffs' motion for the reasons set forth below.

**I.    INTRODUCTION**

Without first conferring with Firestone, and without a single citation to authority, plaintiffs have moved this Court for an order allowing plaintiffs to inspect the tire manufacturing plant in which the subject tire was made. However, Firestone's manufacturing equipment, processes and procedures are trade secret,

and their disclosure would cause Firestone to suffer irreparable competitive harm. Moreover, in the seven years since the subject tire was manufactured, Firestone has updated much of its plant equipment and its processes and procedures. In addition, conditions prevailing in the plant on any given day in 2006 would shed little light on conditions in the plant on the day the subject tire was manufactured seven years ago. Thus, a contemporary inspection would yield little information about the subject tire manufactured in 1999.

## II. BACKGROUND

A. <u>The Subject Tire</u>.

The tire at issue in this case is a size P255/70R15 Firehawk SS10 steel belted radial passenger tire. The tire bears United States Department of Transportation ("DOT") Serial Number "W2M2JBA229," indicating that it was manufactured at Firestone's facility in Wilson, North Carolina, during the twenty-second week of 1999. Firestone no longer manufactures any tires bearing the Firehawk SS10 trade name. Affidavit of Brian J. Queiser, ("Queiser"), ¶ 7 (attached as Exhibit 1).

The subject tire contained more than 20 different components and more than a dozen different rubber compounds. *Id.*, ¶ 8. These materials would have been produced pursuant to different individual specifications using a variety of manufacturing processes and steps, and then brought together in the tire-building area of the Wilson Plant to be assembled into an uncured "green tire" by tire

2

builders utilizing certain types of tire-building equipment. *Id.* The subject tire then would have been cured in a curing press to form the finished tire, trimmed, visually and tactilely inspected, and checked on uniformity and balancing equipment. *Id.* As such, the subject tire would have been the product of literally hundreds of steps involving a number of different processes, procedures and pieces of equipment. *Id.*

      B.    <u>Plaintiffs' Motion to Inspect Premises</u>.

On or about March 1, 2006, plaintiffs filed a Motion for Inspection of Premises, seeking to "enter and inspect the premises of the . . . manufacturing facilities where the subject tire was produced." Plaintiffs' Motion for Inspection of Premises at ¶ 1. Plaintiffs allege in their motion that "one of the likely theories followed by the Plaintiffs will be one or more manufacturing defects contained in the subject tire." *Id.*, ¶ 1. Plaintiffs contend that they "need to perform an inspection of the plant facilities in order to document fully the manufacturing and quality control processes Bridgestone-Firestone follows in the production of tires such as the one at issue in this lawsuit." *Id.*, ¶ 2. Plaintiffs have never served a request pursuant to Ala. R. Civ. Proc. 34(b), or discussed their demand with Firestone.

      C.    <u>Trade Secret Status of the Wilson Plant</u>.

Much of the equipment, processes and procedures used at Firestone's Wilson Plant are trade secret. The plant has about 50 acres of space under one roof and employs state-of-the-art tire manufacturing technology. Queiser, ¶ 9. When

the subject tire was produced in 1999, the Wilson Plant produced many different sizes and types of tires. Information about the equipment and processes used in the manufacture of one tire would not necessarily yield information about those used in another tire, due to the number of variables which create differences between tires built to different specifications. *Id.*

The tire industry is highly competitive. *Id.*, ¶ 10. As a result, tire manufacturers are constantly assessing each other's products and exploring ways to develop a competitive edge, including advances in manufacturing equipment, processes and procedures. *Id.* Competitors cannot do so by analyzing finished tires, because once a tire is cured, it is generally not possible to determine the exact manufacturing equipment, processes and procedures used to make that tire merely from an inspection of the finished product. *Id.* Therefore, knowledge of Firestone's tire component manufacturing equipment, processes and procedures would be of great interest and benefit to Firestone's competitors, because it would give competitors a glimpse into what they otherwise cannot discern from analyzing a cured tire. *Id.*

This is especially true in the manufacturing area where automated equipment and state-of-the-art processes and procedures can give one a significant competitive edge in terms of quality and efficiency. *Id.*, ¶ 11. Where market forces from consumers and original equipment ("OE") vehicle manufacturers require that tire companies maintain high-quality product at a low cost, any

4

competitive advantage can be extremely valuable. *Id.* The equipment, processes and procedures at the Wilson Plant represent many years and millions of dollars of research and development by Firestone. *Id.* Some of the equipment at the Wilson Plant, including equipment that has been installed since the subject tire was manufactured, is custom-designed and used only by Firestone. Any disclosure of the details of this equipment, or Firestone's proprietary processes and procedures, would allow competitors to take advantage of Firestone's enormous investment in the research and development at no cost to themselves. *Id.*

As a result, like all tire companies, Firestone closely guards the trade secret aspects of its manufacturing process. For example, Firestone restricts access to the Wilson Plant to ensure confidentiality and guard against the harm that would result from unfettered access. *Id.*, ¶ 12. Specifically, only authorized visitors are permitted access to the plant, and they must pass through a guarded entrance and be escorted. *Id.* Furthermore, visitors are shown only those portions of the plant that are necessary to accomplish the purpose of their visit. *Id.* Visitor access is limited to those visitors with a business interest specifically requiring an observation of the plant's facilities. *Id.* Firestone applies these safeguards across the board, to automotive manufacturers who purchase OE tires, representatives of private brand tire dealers, representatives of firms that manufacture equipment used at the plant, and business concerns with which Firestone has technical sharing agreements. *Id.*, ¶ 13. Firestone does not generally allow public tours of its plants,

and the specifics of the company's plant equipment, processes and procedures are not known to the general public. *Id.* In fact, without specific authorization, no photographs, videotapes or other recordings are permitted in the plant. *Id.*

Among other reasons, these safeguards are designed to prevent the risk of disclosure that can occur in litigation. As Mr. Queiser indicates, expert witnesses who frequently testify against many manufacturers may seek to draw comparisons (or contrasts) between designs, processes and technology used by different manufacturers. *Id.*, ¶ 14. Disclosure of Firestone's trade secret equipment, processes and procedures at the Wilson Plant to plaintiffs' expert in this case could result in the disclosure of that information, even inadvertently, in cases involving other manufacturers. *Id.* Indeed, any invasion of the secrecy of the equipment, processes and procedures used at the Wilson plant, however limited in theory, would dilute their value. *Id.*, ¶ 18. Disclosure of a trade secret inevitably enhances the risk of further disclosure. Moreover, once a trade secret is disclosed to an outside expert, that information would remain in that expert's memory and be susceptible to use or disclosure, even if inadvertent. The trade secret status of the information would be lost. This also creates the grave risk that the information would be revealed, directly or indirectly, to Bridgestone/Firestone's competitors. *Id.*

Significantly, access to the plant is unnecessary to determine whether the tire was properly manufactured. *Id.*, ¶ 17. In fact, inspection of the plant seven years

6

after the subject tire was manufactured would not provide information about whether the subject tire was manufactured in accordance with its specification. The only way to make that determination is to physically examine the tire itself. *Id.* That is why experts in the tire industry rely on a visual and tactile examination of a failed tire, and, on occasion, physical testing of the tire, to determine if there is evidence that the tire was properly manufactured. *Id.*

    D.    <u>Evolution of the Wilson Plant</u>.

The equipment, processes and procedures currently in place at the Wilson Plant are different from those in place when the subject tire was manufactured in 1999. Since tire manufacturing is an evolutionary process, the past seven years have seen Wilson update much of its state-of-the-art equipment and many of its processes and procedures. *Id.*, ¶ 15. For instance, the Wilson plant currently utilizes proprietary tire building systems that were not in place when the subject tire was manufactured. In addition, as newer equipment is introduced and processes are updated, older equipment and processes are displaced. *Id.* As a result of these changes, an inspection of the plant today would reveal limited information about the manufacture of a steel belted radial passenger tire in 1999. *Id.*

Equally important, because the people, equipment, processes and procedures are different today than they were in 1999, identification of any particular quality assurance, manufacturing, or other conditions in the plant on any given day may

not be representative of the conditions at the time the subject tire was manufactured. *Id.*, ¶ 16.

### III.    ARGUMENT

The Alabama Trade Secrets Act ("ATSA"), Code of Ala. §§ 8-27-1 *et seq.*, defines a trade secret as information that:

    a. Is used or intended for use in a trade or business;
    b. Is included or embodied in a formula, pattern, compilation, computer software, drawing, device, method, technique, or process;
    c. Is not publicly known and is not generally known in the trade or business of the person asserting that it is a trade secret;
    d. Cannot be readily ascertained or derived from publicly available information;
    e. Is the subject of efforts that are reasonable under the circumstances to maintain its secrecy; and
    f. Has significant economic value.

*Id.*, § 8-27-2(1); *see also Ex parte Miltope Corp.*, 823 So. 2d 640, 644 (Ala. 2001). Trade secrets are afforded a qualified privilege under Alabama law.[1] Rule 507, Ala. R. Evid., provides that:

> A person has a privilege…to refuse to disclose and to prevent other persons from disclosing a trade secret owned by the person, if the allowance of the privilege will not tend to conceal fraud or otherwise work injustice.

---

[1] Pursuant to Fed. R. Evid. 501, "in civil actions and proceedings, with respect to an element of a claim or defense as to which State law supplies the rule of decision, the privilege of a witness, person, government, State, or political subdivision thereof shall be determined in accordance with State law."

The Alabama Supreme Court has determined that "[t]rade secrets should receive greater protection from discovery because they 'derive[] economic value from being generally unknown and not readily ascertainable by the public.'" *Miltope*, 823 So. 2d at 645 (quoting *Nester v. Lima Mem'l Hosp.*, 745 N.E.2d 1153, 1157 (Ohio App. 2000)) (modifications in original).  This is because once trade secrets are disclosed, "'the party resisting discovery will have no adequate remedy on appeal.  The proverbial bell cannot be unrung and an appeal after final judgment on the merits will not rectify the damage.'"  *Id*. at 644-45 (quoting *Gibson-Myers & Assoc. v. Pearce*, 1999 Ohio App. LEXIS 5010, *6-7 (Ohio App. Oct. 27, 1999)).  *See also*, *ex parte W.L. Halsey Grocery Co.*, 897 So. 2d 1028, 1034-35 (Ala. 2004) (finding documents relating to sales forecasts, pricing, and other financial information to constitute trade secrets under the ATSA); *Unisource Worldwide, Inc. v. South Central Alabama Supply*, 199 Fed. Supp. 2d, 1194, 1209-10 (M.D. Ala. 2001) (finding price lists and cost information likely to be trade secrets under the ATSA).

*Miltope* was a breach of contract action brought by a former employee in which the plaintiff sought production of various corporate records including sales orders, minutes of the board of directors, and projected and actual profit statements for certain products on which the employee claimed he should have received commission.  823 So. 2d at 642.  Overruling the defendant's objection to the document requests, the trial court entered a protective order severely restricting

9

dissemination of the information to specific groups of people involved in the litigation, including counsel of record and their expert witnesses (who were not employees of either party and who likewise agreed to be bound by the order.) *Id*. The defendant complied with the order, in part, but moved for reconsideration with respect to materials it contended were trade secret, and, when the trial court denied its motion, defendant petitioned for a writ of mandamus. *Id*. at 643.

The Supreme Court found that defendant had established that the records were trade secret under the ATSA, and held that the trial court abused its discretion in ordering the production of the trade secret information even with a protective order. *Id*. at 645-646. The Court noted that:

> The danger of entrusting [plaintiff] with Miltope's trade secrets is that doing so could harm Miltope and there may be no sanctions sufficient to protect Miltope in the event [plaintiff] fails to abide by the terms of the protective order; there also may be no system of monitoring what [plaintiff] or his current employer, a business in competition with Miltope, do with the information it would be able to glean from this expansive discovery.

*Id*. at 644. Moreover, the Court held that the "protective order does not adequately safeguard the confidentiality" of the information because "the probable dispersion of the trade secrets is practically unlimited and the safeguards are clearly inadequate." *Id.* at 645. Finally, the Court noted that plaintiff had failed to demonstrate that the trade secret information was necessary for his case because plaintiff offered "only the possibility that, if his discovery motion is granted, he

10

will find that Miltope engaged in a pattern of misrepresentation to other employees. This mere possibility does not outweigh the likelihood of irreparable harm to Miltope." *Id.* *See, e.g., Long v. Allstate Ins. Co.*, 2004 U.S. Dist. Lexis 14762, * (D. Colo. 2004) (denying motion to compel plant inspection "supported by argument only").

The parallels between *Miltope* and the instant case are many. Here, Firestone has demonstrated that the Wilson Plant contains trade secrets entitled to protection under Alabama law. Firestone's proprietary equipment, processes and procedures are:

> a. used as part of its business;
> b. embodied in a method, technique, or process for manufacturing tires;
> c. not publicly known and not generally known in the tire manufacturing industry;
> d. not able to be readily ascertained or derived from publicly available information;
> e. the subject of efforts that are reasonable under the circumstances to maintain their secrecy; and
> f. of significant economic value to the company.

*See* Queiser ¶¶ 9-16, 18; ATSA § 8-27-2(1).

Second, plaintiffs have not demonstrated that their need for a plant tour outweighs the likelihood of irreparable harm to Firestone. Plaintiffs have stated, without any record support, that they need to inspect the plant to "document fully the manufacture and quality control processes" used in that plant. In contrast, Firestone has demonstrated through the testimony of Mr. Queiser that disclosure of

11

its trade secrets to experts regularly retained in cases involving Firestone's competitors would create a real and substantial risk of improper disclosure of its trade secret information. *See Id.* at *9 ("unrefuted affidavit [of manufacturer] establishes that the inspection…would result in the disclosure of its trade secrets and confidential information").

Moreover, a plant inspection is not only unlikely to reveal evidence regarding the details of how the subject tire was manufactured, it is unnecessary in order to determine whether a manufacturing defect exists in the subject tire. Queiser, ¶ 17. In fact, Firestone no longer manufactures any tires with the Firehawk SS10 brand name. *Id.*, ¶ 7. In addition, it has been seven years since the subject tire was manufactured, and Firestone has since updated much of its plant equipment and its processes and procedures. *Id.*, ¶ 15. Therefore, plaintiffs have failed to demonstrate that their need for the trade secret information outweighs the potential for irreparable harm, and plaintiffs' motion should be denied. *Compare Long*, *supra*, at *9 (denying motion to compel plant inspection where "the requested inspection is irrelevant to the facts and issues in this case because of changes to [the defendant's] plant since the product at issue was manufactured four years ago").

This issue has arisen in other cases involving tire manufacturers. For example, a Florida court has recognized and protected the trade secret nature of a tire company's manufacturing plant. *See, e.g. Goodyear Tire & Rubber Co. v.*

*Cooey*, 359 So.2d 1200, 1202-1203 (1st DCA 1978) (quashing discovery order allowing inspection of Goodyear tire plant), copy attached as Exhibit 2. In *Cooey*, the trial court had entered a discovery order allowing the plaintiff access to Goodyear's Union City, Tennessee, plant, in order to inspect the "processes, procedures and equipment used in the production of tires substantially identical or similar to the tire which allegedly failed." 359 So.2d at 1201. Goodyear sought and was granted interlocutory review of the trial court's order, and the First District quashed the order. The appellate court found that interlocutory appeal was proper, because once the trade secret plant information was revealed it could not be remedied by later appeal. *Id*. The appellate court further found that Goodyear's plant equipment, processes and procedures constituted trade secrets, which would be "immediately discoverable by any expert allowed unrestricted access to the plant." 359 So.2d at 1203. Accordingly, the appellate granted Goodyear's petition for *certiorari* and quashed the underlying discovery order. *Id*.

Courts elsewhere have come to the same conclusion. For example, in *Coleman Williams v. Continental General Tire, et al.*, No. 3-01-CV-184-D, (U.S. Dist. Ct. N.D. Texas), the court stated:

> Plaintiffs' stated need for the discovery as described by their expert Jon Crate…is to learn how Continental General manufactures its tires and to discover some other factors which he claims only can be done by inspecting the plant. In my opinion this falls far short of demonstrating that a plant inspection is necessary to prevent fraud or injustice, particularly where the production methods currently

13

employed are substantially different from those in place in 1996 and 1997.

*See* Order dated March 21, 2002, attached as Exhibit 3.  *See also In re Continental Tire North America, Inc.*, 74 S.W.3d 884 (Tex. App. 2002), copy attached as Exhibit 4; *Riley v. Continental General Tire, Inc.*, No. 01-41286 (5th Cir. 2002) (vacating order permitting inspection of a CTNA plant), copy attached as Exhibit 5; *In re Ford Explorer / Firestone ATX & Wilderness Tire Litigation*, No. CV-1998-009813 (Super. Ct., Maricopa County, Ariz.), copy attached as Exhibit 6. This Court should do the same.

## IV.  CONCLUSION

Plaintiffs' motion to compel should be denied.  Plaintiffs have offered nothing but argument in support of their demand to inspect Firestone's Wilson plant.  In contrast, Firestone has demonstrated that its equipment, processes and procedures are indisputably trade secrets, the disclosure of which would cause irreparable harm.  Moreover, plaintiffs have not, and cannot, demonstrate that a plant inspection is necessary or would yield any relevant information.  Therefore, plaintiffs' motion should be denied.

Respectfully submitted,

/s Kenneth M. Perry
One of the Attorneys for
Bridgestone Firestone North American Tire, LLC

<u>OF COUNSEL</u>
Brittin T. Coleman (COL004)
Kenneth M. Perry (PER048)
Hope T. Cannon (STE147)
Bradley Arant Rose & White LLP
One Federal Place
1819 Fifth Avenue North
Birmingham, AL 35203-2104
Telephone: (205) 521-8000; Facsimile: (205) 521-8800

## CERTIFICATE OF SERVICE

I hereby certify that on May 22, 2006, I electronically filed the foregoing with the Clerk of the Court, using the CM/ECF system which will send notification of such filing to the following:

**Attorneys for Plaintiffs:**
Edward P. Kendall, Esq.
Michael G. Strickland, Esq.
Blaine C. Stevens, Esq.
Strickland And Kendall, LLC
420 South Lawrence Street
Post Office Box 99
Montgomery, AL 36101-0099

Will R. Kelly, Esq.
P.O. Drawer 937
Hayneville, AL 36040-0937

**Attorneys for Phil Owens Used Cars, Inc.**
William A. Mudd, Esq.
James M. Strong, Esq.
Miller, Hamilton, Snider & Odom, LLC
1200 Financial Center
505 20th Street North
Birmingham, AL 35203

**Attorneys for Bendix Commercial Vehicle System, LLC:**
Larry W. Harper, Esq.
Keith J. Pflaum, Esq.
Porterfield, Harper, Mills & Motlow, P.A.
22 Inverness Center Parkway
Birmingham, AL 35242-4821

**Attorneys for General Motors Corporation:**
M. Christian King, Esq.
Sarah O. Warburton, Esq.
Lightfoot, Franklin & White
400 20th Street North
Birmingham, AL 35203

Robert D. Hays, Esq.
L. Frank Coan, Jr., Esq.
Robert L. Arrington, Jr., Esq.
King & Spalding, LLP
1180 Peachtree Street
Atlanta, GA 30309-3521

**Attorneys for TRW Vehicle Safety Systems, Inc. and TRW Automobile US, LLC :**
Jack E. Little, Jr.
Pillsbury Winthrop Shaw Pittman LLP
Two Houston Center
909 Fannin 22nd Floor
Houston, TX 77010

Chad W. Bryan
James N. Walter, Jr.
Capell Howard, P.C.
P.O. Box 2069
Montgomery, AL 36102-2069

**Attorneys for May Brothers, Inc.:**
Jay S. Tuley, Esq.
Nix, Holtsford, Gilliland,
     Higgins & Hitson, P.C.
Post Office Box 4128
Montgomery, AL 36103-4128

and I hereby certify that I have mailed by United States Postal Service the document to the following non-CM/ECF participants:

Robert L. Arrington, Jr.
Anne M. Carter
King & Spalding, LLP
1180 Peachtree Street
Atlanta, GA  30309-3521

J. Kenneth Wainwright, Jr.
Harvey Kruse P.C.
1050 Wilshire Drive, Suite 320
Troy, MI  48084-1526

David B. Weinstein
Pillsbury Winthrop Shaw Pittman LLP
Two Houston Center
909 Fannin, Suite 2200
Houston, TX  77010

                                            s/Kenneth M.Perry
                                            One of the Attorneys for
                                Bridgestone Firestone North American
                                                        Tire, LLC