UNITED STATES DISTRICT COURT
MIDDLE DISTRICT OF ALABAMA
NORTHERN DIVISION

| | |
|---|---|
| HARRISON JOHNSON, JR., et al., ) | |
| ) | |
| Plaintiffs, ) | |
| ) | |
| v. ) | CIVIL ACTION NUMBER: |
| ) | 2:06CV00290-MEF |
| BRIDGESTONE FIRESTONE NORTH ) | |
| AMERICAN TIRE, LLC, et al., ) | |
| ) | |
| Defendants. ) | |

## AFFIDAVIT OF BRIAN J. QUEISER IN SUPPORT OF BRIDGESTONE FIRESTONE NORTH AMERICAN TIRE, LLC'S RESPONSE TO PLAINTIFFS' MOTION FOR INSPECTION OF PREMISES

BEFORE ME, the undersigned authority, duly appeared Brian J. Queiser, and after being duly sworn, states as follows:

1. My name is Brian J. Queiser. I am over eighteen (18) years of age and I am competent to testify in all respects. I have personal knowledge regarding the matters stated in this affidavit. If called to testify, I could and would testify consistently with the statements in this affidavit.

2. I hold a Bachelor of Science degree in Aeronautical and Astronautical Engineering from Purdue University and a Master of Science degree in Engineering Mechanics from The Ohio State University.

3. I have been continuously employed by Bridgestone/Firestone, Inc. and then Bridgestone Americas Holding, Inc. at the Akron Technical Center since January 1994. Initially, I was assigned as an engineer in the Advanced Tire Technology Division and in August 1995 assigned as an engineer in the Passenger and Light Truck Tire Development Division. In March

2001, I transferred to the Product Analysis Department, in which I currently hold the position of Manager.

4. I have personally developed steel belted radial tires from concept through prototype development and testing, final engineering approval, and ultimately to production. The development process is rigorous, involving advanced engineering design tools such as computer aided modeling, prototyping, and extensive testing. My duties have also included requesting, performing, and evaluating the results of thousands of tire tests, conducted both within the laboratory on specialized tire testing equipment and carried out at test tracks on vehicles.

5. As a result of my job responsibilities and years of experience, I have acquired a detailed knowledge of tire engineering, including tire design, development, construction, materials, specification, testing, and performance. My extensive training and experience include performing failure and causal analyses on failed or damaged tires from the field and those that were subject to internal testing. I have reviewed and become familiar with the manufacturing, quality control, and field performance processes and techniques utilized by Bridgestone/Firestone, Inc. and its successor, Bridgestone Firestone North American Tire, LLC (collectively, "Bridgestone/Firestone"). In addition, I have had the opportunity to visit Bridgestone/Firestone's manufacturing facilities, including the plant in Wilson, North Carolina, and I am familiar with the equipment, processes and procedures in use at that plant.

6. Currently, my primary responsibilities include tire analysis, along with basic engineering and research projects related to products manufactured by Bridgestone/Firestone. As a regular part of my duties, I examine, test, and evaluate tires that are alleged to have become disabled in use and/or are involved in litigation.

7. I am generally familiar with the tire which is the subject of this litigation ("the subject tire"). The subject tire has been identified as a P255/70R15 Firestone Firehawk SS10 steel belted radial passenger tire bearing United States Department of Transportation ("DOT") Serial Number W2M2JBA229. As the serial number indicates, this tire was manufactured at Bridgestone/Firestone's facility in Wilson, North Carolina ("Wilson Plant") during the 22nd week of 1999. Bridgestone/Firestone no longer manufactures Firestone Firehawk SS10 tires.

8. The subject tire contained more than 20 different components and more than a dozen different rubber compounds. These materials would have been produced pursuant to different individual specifications using a variety of manufacturing processes and steps, and then brought together in the tire-building area of the Wilson Plant to be assembled into an uncured "green tire" by tire builders utilizing certain types of tire-building equipment. The subject tire then would have been cured in a mold and curing press to form the finished tire. Final steps include trimming the tire, visual and tactile inspections, and uniformity and balancing tests using specialized equipment. As such, the subject tire would have been the product of literally hundreds of steps involving a number of different processes, procedures, and pieces of equipment.

9. I understand that the plaintiffs have filed a motion to inspect the Wilson Plant. Much of the equipment, processes, and procedures used at Bridgestone/Firestone's Wilson Plant are considered by Bridgestone/Firestone to be trade secret. The plant has about 50 acres of space under roof and employs state-of-the-art tire manufacturing technology. When the subject tire was produced in 1999, the Wilson Plant produced many different sizes and types of tires. As discussed above, the building of any given tire at the Wilson Plant would have involved literally hundreds of steps, using many different processes, procedures, and different types of equipment. Thus, information about the equipment and processes used in the manufacture of one tire would

not necessarily yield information about those used in another tire, due to the number of variables which create differences between tires built to different specifications.

10. The tire industry is highly competitive. As a result, tire manufacturers are constantly assessing each other's products and exploring ways to develop a competitive edge, including advances in manufacturing equipment, processes, and procedures. However, it is generally not possible to determine the manufacturing equipment, processes, and procedures used to make that tire merely from an inspection of the finished product. Therefore, knowledge of Bridgestone/Firestone's tire component manufacturing equipment, processes, and procedures would be of great interest and benefit to Bridgestone/Firestone's competitors, because it would give competitors a glimpse into what they otherwise cannot discern from analyzing a cured tire.

11. This is especially true in the manufacturing area where automated equipment and state-of-the-art processes and procedures can give one a significant competitive edge in terms of quality and efficiency. Where market forces from consumers and original equipment ("OE") vehicle manufacturers require that tire companies maintain high-quality product at a low cost, any competitive advantage can be extremely valuable. The equipment, processes, and procedures at the Wilson Plant represent many years and millions of dollars of research and development by Bridgestone/Firestone. Some of the equipment at the Wilson Plant, including equipment that has been installed since the subject tire was manufactured, is custom-designed and used only by Bridgestone/Firestone. Any disclosure of the details of this equipment, or Bridgestone/Firestone's proprietary processes and procedures, would allow competitors to take advantage of Bridgestone/Firestone's enormous investment in the research and development at no cost to themselves.

12. As a result, Bridgestone/Firestone, like other tire companies, closely guards the trade secret aspects of its manufacturing process. For example, Bridgestone/Firestone restricts

4

access to the Wilson Plant to ensure confidentiality and guard against the harm that would result from unfettered access. Specifically, only authorized visitors are permitted access to the plant, and they must pass through a guarded entrance and be escorted. Furthermore, visitors are shown only those portions of the plant that are necessary to accomplish the purpose of their visit. Visitor access is limited to those visitors with a business interest specifically requiring an observation of the plant's facilities.

13. Bridgestone/Firestone applies these safeguards across the board, to automotive manufacturers who purchase OE tires, representatives of private brand tire dealers, representatives of firms that manufacture equipment used at the plant, and business concerns with which Bridgestone/Firestone has technical sharing agreements. Bridgestone/Firestone does not generally allow public tours of its plants, and the specifics of the company's plant equipment, processes and procedures are not known to the general public. In fact, without specific authorization, no photographs, videotapes, or other recordings are permitted in the plant.

14. Among other reasons, these safeguards are designed to prevent the risk of disclosure that can also occur in litigation. For instance, expert witnesses who frequently testify against numerous tire manufacturers may seek to draw comparisons (or contrasts) between designs, processes, and technology used by the different tire companies. Disclosure of Bridgestone/Firestone's trade secret equipment, processes, and procedures at the Wilson Plant to the plaintiffs' expert in this case could result in the disclosure of that information, even inadvertently, in cases involving other tire manufacturers.

15. The equipment, processes and procedures currently in place at the Wilson Plant are different from those in place when the subject tire was manufactured in 1999. Since tire manufacturing is an evolutionary process, the past seven years have seen the Wilson Plant update much of its state-of-the-art equipment and many of its processes and procedures. For instance,

the Wilson Plant currently utilizes proprietary tire building systems that were not in place when the subject tire was manufactured. In addition, as newer equipment is introduced and processes are updated, older equipment and processes are displaced. As a result of these changes, an inspection of the plant today would reveal limited information about the manufacture of a steel belted radial passenger tire in 1999.

16. Equally important, because the people, equipment, processes, and procedures are different today than they were in 1999, identification of any particular quality assurance, manufacturing, or other conditions in the plant on any given day may not be representative of the conditions at the time the subject tire was manufactured.

17. I also understand that plaintiffs contend a plant inspection is necessary because one of their theories is that the subject tire had a manufacturing defect. Access to the plant is unnecessary to determine whether the tire was properly manufactured. In fact, inspection of the plant seven years after the subject tire was manufactured would not provide information about whether the subject tire was manufactured in accordance with its specification. The only way to make that determination is to physically examine the tire itself. In my experience, experts in the tire industry rely on a visual and tactile examination of a failed tire, and, on occasion, physical testing of the tire, to determine if there is evidence that the tire was properly manufactured.

18. Any invasion of the secrecy of the equipment, processes, and procedures used at the Wilson Plant, however limited in theory, would dilute their value. Disclosure of a secret inevitably enhances the risk of further disclosure. Moreover, once a secret is disclosed to an outside expert, that information would remain in that expert's memory and be susceptible to use or disclosure, even if inadvertent. The trade secret status of the information would be lost. This also creates the grave risk that the information would be revealed, directly or indirectly, to Bridgestone/Firestone's competitors.

19. For these reasons above, there is no need—much less, a compelling one—to invade the trade secret nature of Bridgestone/Firestone's operations at its Wilson plant.

FURTHER, AFFIANT SAYETH NOT.

*[signature]*
BRIAN J. QUEISER

STATE OF OHIO    )
                 )
COUNTY OF SUMMIT )

The foregoing instrument was acknowledged before me this 25th day of April, 2006, by Brian J. Queiser, who is personally known to me and who did take an oath.

*[signature]*
NOTARY PUBLIC

Amelia S. Breckenridge
Notary Public
Residence - Portage Cty
State Wide Jurisdiction, Ohio
My Commission Expires December 7, 2006